1
2
3
4

UNITED STATES DISTRICT COURT

5

DISTRICT OF NEVADA

6

* * *

7

BETTY C. UNCANGO,

Case No. 2:14-cv-00824-APG-PAL

8

                                          Plaintiff,

9

        v.

**REPORT OF FINDINGS AND
RECOMMENDATION**

10

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

(Mot. To Remand – ECF No. 21)
(Cross-Mot. to Affirm – ECF No. 23)

11
12

                                          Defendant.

13

        This matter involves Plaintiff Betty C. Uncango's appeal and request for judicial review

14

of the Acting Commissioner of Social Security, Defendant Carolyn W. Colvin's final decision

15

denying her claim for supplemental security income under Title XVI of the Social Security Act

16

(the "Act"), 42 U.S.C. §§ 1381–83.

17

## BACKGROUND

18

**I.    PROCEDURAL HISTORY**

19

        On August 16, 2010, Ms. Uncango protectively filed for supplemental security income

20

benefits.  AR 118–24.[1]  She initially alleged she became disabled on February 1, 1996, at the age

21

of 29.  AR 118.  However, she later amended the alleged onset date to her protective filing date

22

to August 16, 2010.  AR 48, 127.  Ms. Uncango was 43 years old at the time she applied.

23

AR 38.  In her disability application, she claimed she was unable to work because of diabetes,

24

high cholesterol, asthma, joint pain, insomnia, anxiety, goiter, high blood pressure, neuropathy,

25

arthritis.  AR 129.  The SSA denied her application initially and on reconsideration.  AR 74–77,

26

83–85.

27
28

[1]  AR refers to the Administrative Record (ECF No. 15-1), a certified copy of which was delivered to the
undersigned upon the Commissioner's filing of her Answer (ECF No. 11).

An administrative law judge ("ALJ") held a hearing on April 9, 2012, where Ms. Uncango appeared with counsel.  AR 45–71.  The ALJ accepted testimony from Uncango, AR 48–66, and a vocational expert, AR 66–70.  During the hearing, Ms. Uncango's counsel asserted that the theory of her case stemmed from Uncango's diabetes with neuropathy and retinopathy, asthma, migraine headaches, arthritis, and depression.  AR 49.  The ALJ found that, despite her allegations of debilitating pain, Uncango's testimony revealed a somewhat normal level of daily activity and the medical records indicated that her impairments were being medically managed.  AR 33–37.

In a decision dated July 13, 2012, the ALJ found that Ms. Uncango was not disabled. AR 31–39.  She requested review of the ALJ's decision by the Appeals Council, but the ALJ's decision became final when the Appeals Council denied review on March 26, 2014.  AR 1–4. On May 22, 2014, Uncango filed a Complaint (ECF No. 1-1) in federal court, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  The Commissioner filed her Answer (ECF No. 11) on September 15, 2014.  Ms. Uncango filed a Motion to Remand (ECF No. 21), and the Commissioner filed a Response and Cross-Motion for Summary Judgment (ECF Nos. 22, 23).  No reply brief was filed and the deadline for doing so has expired. The court has considered the Motion and the Response and Cross-Motion.

## DISCUSSION

I.   APPLICABLE LAW

    A.    Judicial Review of Disability Determination

District courts review administrative decisions in social security benefits cases under 42 U.S.C. § 405(g).  *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).  The statute provides that after the Commissioner has held a hearing and rendered a final decision, a disability claimant may seek review of that decision by filing a civil lawsuit in a federal district court in the judicial district where the disability claimant lives.  42 U.S.C. § 405(g).  The statute also provides that the district court may enter, "upon the pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Id.*

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005). But the Commissioner's findings may be set aside if they are based on legal error or not supported by substantial evidence. *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006). The Ninth Circuit defines substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, a court "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence'." *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014) (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

Under the substantial evidence test, a court must uphold the Commissioner's findings if they are supported by inferences reasonably drawn from the record. *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2003). When the evidence will support more than one rational interpretation, a court must defer to the Commissioner's interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Consequently, the issue before a court is not whether the Commissioner could reasonably have reached a different conclusion, but whether the final decision is supported by substantial evidence.

It is incumbent upon an ALJ to make specific findings so that a court does not speculate as to the basis of the findings when determining if the Commissioner's decision is supported by substantial evidence. *See Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014). Mere cursory findings of fact without explicit statements about what portions of the evidence were accepted or rejected are not sufficient. *Lewin v. Schweiker*, 654 F.2d 631, 634 (9th Cir. 1981). An ALJ's findings should be comprehensive, analytical, and include a statement explaining the "factual foundations on which the ultimate factual conclusions are based." *Id. See also Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984) (an ALJ need not discuss all the evidence in the record, but must explain why significant probative evidence has been rejected).

### B. Disability Evaluation Process

A claimant has the initial burden of proving disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995).  To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant must provide specific medical evidence to support his or her claim of disability.  *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998).  If a claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy.  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (noting that a claimant bears the burden of proof until the final step in the evaluation process).

## II. THE ALJ'S DECISION

An ALJ follows a five-step sequential evaluation process in determining whether an claimant is disabled.  20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  If at any step an ALJ makes a finding of disability or non-disability, no further evaluation is required. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

Here, the ALJ followed the five-step sequential evaluation process and issued an unfavorable decision on July 13, 2012 (the "Decision").  AR 31–39.  Ms. Uncango does not challenge the ALJ's findings at steps one through three, but asserts legal error at step four.  Specifically, she contends that the ALJ rejected her credibility by improperly assessing her subjective symptom testimony.

### A. Step One

The first step of the disability evaluation requires an ALJ to determine whether the claimant is currently engaging in substantial gainful activity ("SGA").  20 C.F.R. §§ 404.1520(b), 416.920(b).  SGA is defined as work activity that is both substantial and gainful; it involves doing significant physical or mental activities, usually for pay or profit.  20 C.F.R. §§ 404.1572(a)–(b), 416.972(a)–(b).  If the claimant is currently engaging in SGA, then a finding

/ / /

4

of not disabled is made.  If the claimant is not engaging in SGA, then the analysis proceeds to the second step.

At step one in the Decision, the ALJ found that Ms. Uncango had not engaged in SGA since August 16, 2010, the amended alleged onset date.  AR 33.  Given Uncango's lack of SGA, the ALJ's analysis proceeded to the second step.

### B.    Step Two

The second step of the disability evaluation addresses whether a claimant has a medically-determinable impairment that is severe or a combination of impairments that significantly limits him or her from performing basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the claimant's ability to work.  20 C.F.R. §§ 404.1521, 416.921; Social Security Rulings ("SSRs") 85-28 (Jan. 1, 1985), 96-3p, 61 Fed. Reg. 34468 (July 2, 1996); 96-4p, 61 Fed. Reg. 34488 (July 2, 1996).[2]  If a claimant does not have a severe medically-determinable impairment or combination of impairments, then an ALJ will make a finding that a claimant is not disabled.  If a claimant has a severe medically-determinable impairment or combination of impairments, then an ALJ's analysis proceeds to the third step.

### 1.    Ms. Uncango's Severe Physical Impairment: Diabetic Neuropathy

At step two in the Decision, the ALJ found that Ms. Uncango had the severe impairment of diabetic neuropathy.  AR 33.  She was evaluated and treated for the following medically determinable impairments: asthma, goiter, hypertension, insulin-dependent diabetes mellitus, history of headaches and nausea, and history of fractured little toe.  *Id*.  However, these conditions were being medically managed and would be properly controlled as long as Uncango adhered to recommended medical management and medication compliance.  *Id*.  Additionally, no aggressive treatment was recommended or anticipated for these conditions.  *Id*.  Thus, other

---

[2] SSRs are the SSA's official interpretations of the Act and its regulations.  *See Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see also* 20 C.F.R. § 402.35(b)(1).  They are entitled to some deference as long as they are consistent with the Act and regulations.  *See Bray*, 554 F. 3d at 1223 (finding ALJ erred in disregarding SSR 85-41).

than diabetic neuropathy, Ms. Uncango's medically determinable impairments were non-severe. *Id*.

### 2. <u>Ms. Uncango's Non-Severe Mental Impairments</u>

When the SSA evaluates the severity of mental impairments, 20 C.F.R. § 404.1520a requires the use of a "special technique" to evaluate four broad functional areas known as the "Paragraph B Criteria" in Listing 12.00C of the Listing of Impairments set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id. See also* 20 C.F.R. § 1520a (explaining the psychiatric review technique); SSR 96-8p, 61 Fed. Reg. 34474 (July 2, 1996) (noting that application of the technique is documented on a Psychiatric Review Technique Form). Paragraph B criteria require a claimant to show that he or she experienced marked limitations in mental function. *Id*. § 12.00. To satisfy Paragraph B criteria, mental impairments must result in at least two of the following: (i) marked restriction in activities of daily living; (ii) marked difficulties in maintaining social functioning; (iii) marked difficulties in maintaining concentration, persistence, or pace; or (iv) repeated episodes of decompensation, each of extended duration. *See, e.g.*, *id*. § 12.04(B). A "marked" limitation means "more than moderate but less than extreme." *Id*. § 12.00(C). Repeated episodes of decompensation with extended duration means three episodes within one year, or an average of once every four months, each lasting for at least two weeks. *Id*. § 12.00(C)(4).

If the Paragraph B criteria are not met, a claimant may nevertheless be found disabled under alternative "Paragraph C criteria." *Id*. § 12.00(A). Under the regulations, Paragraph C criteria are considered only if the Paragraph B criteria are not satisfied. *Id*. Paragraph C criteria require a medically documented history of a chronic affective disorder of at least two years duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years in ability to function outside a highly

1    supportive living arrangement, with an indication of continued need for such arrangement. *See*

2    20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02(C), 12.03(C), 12.04(C), 12.05(C), 12.06(C).

3         At step two in the Decision, the ALJ determined that Ms. Uncango had two non-severe

4    mental impairments: affective mood disorder and anxiety related disorder.  AR 33.  The ALJ

5    noted that the record contained no treatment records for psychiatric claims.  *Id*.  Thus, the

6    medical evidence did not support a finding that Uncango's mental impairments were severe.  *Id*.

7    The ALJ also considered the four broad functional areas set out in the disability regulations for

8    evaluating mental disorders.  AR 34.  He specifically evaluated the Paragraph B Criteria and

9    concluded that the evidence showed that Ms. Uncango suffered: (i) no limitation in activities of

10   daily living; (ii) no limitation in social functioning; (iii) mild limitations in concentration,

11   persistence, or pace; and (iv) no episodes of decompensation that have been of extended

12   duration.  *Id*.  *See also* AR 196–209, 267–80 (Psychiatric Review Technique Forms completed

13   by Mark Richman, Ph.D., and Pastora Roldan, Ph.D.).  The ALJ also considered Paragraph C

14   criteria for Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders).  AR 34.

15   However, the record failed to establish the presence of Paragraph C criteria.  *Id*.  Given the lack

16   of medical evidence and the absence of paragraph B or C criteria, the ALJ found that Uncango's

17   mental disorders, considered singly and in combination, did not limit her ability to perform basic

18   mental work activities.  AR 33–34.  Uncango's affective mood disorder and anxiety related

19   disorder were therefore non-severe.  *Id*.

20        To summarize his findings at step two, the ALJ found Uncango had one *severe*

21   impairment,  diabetic neuropathy, as well as numerous *non-severe* impairments: asthma, goiter,

22   hypertension, insulin-dependent diabetes mellitus, history of headaches and nausea, history of

23   fractured little toe disorder, affective mood disorder, and anxiety related disorder.  AR 33–34.

24   Because Uncango had one severe medically-determinable impairment, the ALJ's analysis

25   proceeded to the third step.

26        **C.    Step Three**

27        Step three of the disability evaluation requires an ALJ to determine whether a claimant's

28   impairments  or  combination  of  impairments  meet  or  medically  equal  the  criteria  of  an

7

impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, which is commonly referred to as the "Listings."   20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.826.  If a claimant's impairment or combination of impairments meet or equal the criteria of the Listings and meet the duration requirement (20 C.F.R. §§ 404.1509, 416.909), then an ALJ makes a finding of disability.  20 C.F.R. §§ 404.1520(h), 416.920(h).  If a claimant's impairment or combination of impairments does not meet or equal the criteria of the Listings or meet the duration requirement, then the analysis proceeds to the next step.

At step three in the Decision, the ALJ found that the evidence did not support a finding that Ms. Uncango had the severity of symptoms required, either singly or in combination, to meet or equal Listings 1.02 (major dysfunction of a joint(s)), 1.04 (disorders of the spine), 3.03 (asthma), 11.14 (peripheral neuropathies), 12.04 (affective disorders), and 12.06 (anxiety-related disorders). AR 34.  No treating or examining physician stated findings equivalent in severity to the criteria of any listed impairment, and the evidence did not present medical findings equivalent in severity to the criteria of any listed impairment.  *Id*.  Thus, the ALJ concluded that Uncango did not have an impairment or combination of impairments that meet or medically equal one of the impairments described in the Listings.  *Id*.  As such, the ALJ's analysis continued to Uncango's residual functional capacity ("RFC").

### D.    Step Four – Uncango's RFC and ability to perform PRW

The fourth step of the disability evaluation requires an ALJ to determine whether a claimant has the RFC to perform her past relevant work ("PRW").  20 C.F.R. §§ 404.1520(f), 416.920(f).  To answer this question, an ALJ must first determine a claimant's RFC.  20 C.F.R. §§ 404.1520(e), 416.920(e).  RFC is a function-by-function assessment of a claimant's ability to do physical and mental work-related activities on a sustained basis despite limitations from impairments.  SSR 96-8p, 61 Fed. Reg. 34474 (July 2, 1996).  In making this finding, an ALJ must consider all the relevant evidence such as symptoms and the extent to which they can be reasonably be accepted as consistent with the objective medical evidence and other evidence.  20 C.F.R. §§ 404.1529, 416.929; SSR 96-4p, 61 Fed. Reg. 34488 (July 2, 1996); 96-7p, 61 Fed. Reg. 34483 (July 2, 1996).  To the extent that statements about the intensity, persistence, or

functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, an ALJ must make a finding on the credibility of a claimant's statements based on a consideration of the entire case record.  An ALJ must also consider opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 61 Fed. Reg. 34489 (July 2, 1996); 96-5p, 61 Fed. Reg. 34471 (July 2, 1996); and 06-3p, 71 Fed. Reg. 45593 (Aug. 9, 2006).

After considering the entire record, the ALJ concluded that Uncango had the RFC to perform light work as defined in 20 C.F.R. § 416.967(b) including:

> occasional postural activities; occasional use of the nondominant left upper extremity with no nondominant left upper extremity overhead lifting; avoid concentrated exposure to extreme-temperatures, chemicals, and pulmonary irritants; and avoid concentrated exposure to hazardous machinery, unprotected heights, and operational control of moving machinery.

AR 34–35.  In making this finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and the other evidence."  AR 35.  He also considered opinion evidence.  *Id*.  Although the ALJ found that Uncango's impairments could reasonably be expected to cause her alleged symptoms, the ALJ determined that her statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent they were inconsistent with the RFC assessment.  AR 36.

The ALJ found that Ms. Uncango's activities of daily living and testimony undermined her credibility.  AR 35–36.  She alleged she experienced diabetes, carpal tunnel syndrome, high cholesterol, asthma, insomnia, goiter, high blood pressure, neuropathy, arthritis, anxiety, and depression.  *See* AR 129, 155, 163 (Disability Reports).  She claimed her impairments caused difficulty with activities of daily living, personal care, exertional and nonexertional activity, postural activity, pain, and working.  AR 158, 166.

Despite her alleged impairments, in September 2010, Ms. Uncango reported that her activities of daily living included checking her blood sugar, taking insulin shots, preparing and having simple meals with her daughters, helping her daughters with their homework, and watching television.  AR 35, 147–54.  She stated she had no difficulty with personal care, except

requiring additional time due to her left arm pain.  AR 35, 148.  She admitted she could do housework including washing dishes, washing clothes, dusting, and vacuuming.  AR 35, 149. She reported she could drive, tried to go outside at least once a day, and could shop in stores for food and sundries.  AR 35, 150.  She acknowledged she enjoyed listening to music, watching television with her kids, and spent time talking on the phone with her mother everyday or as often as she could.  AR 35, 151.  She denied use of any aids such as crutches, walker, wheelchair, cane, glasses, or contact lenses.  AR 153.

Despite her daily activities, Ms. Uncango reported that her impairments affected her lifting, standing, reaching, walking, kneeling, stair climbing, using hands, and completing tasks. AR 152.  She stated that she could only walk for 20 feet before she needed to take a five-minute rest.  AR 35, 152.  When asked if she finished what she started, Uncango marked "no" but later noted that she can follow spoken instructions.  AR 35, 152.  She stated she got along with others and had no problems handling changes in routine, although she noted that she did not handle stress well because it elevated her blood sugar level.  AR 35, 153.

During the administrative hearing, Ms. Uncango testified that each day she checks her blood sugar, injects insulin, and takes medications for her various impairments.  AR 51–52. When asked why she is unable to work, Uncango explained that she had pain in her lap from diabetic neuropathy and in her hands from arthritis, which limited the use of her left arm. AR 53–55.  She also testified that she experienced migraine headaches about three times per week.  AR 55.  She testified that she drives her daughter to school every morning and drives herself to doctor's appointments and the grocery store.  AR 56–57.  During the day, Uncango testified that she attempts cleaning around the house, including washing dishes, vacuuming, and laundry.  AR 57–59.  She would lie down and take her pain medication if her daily activities and chores gave her pain.  AR 62.  When asked why she would be unable to work an eight-hour shift, Uncango stated

> To sit down just for a couple of hours, my back starts to hurt.  To stand up for so long, my feet starts to hurt, my lap starts to hurt, my leg starts to shake.  I have

/ / /

10

1    asthma, you know, it's short breath just standing, you know, an hour or half hour I
2    start to have my asthma….

3    AR 64–65.

4        The ALJ also considered the third party function report completed by Linda T.

5    Chargualaf in September 2010.  AR 36 (citing AR 139–46).  Although a layperson can offer an

6    opinion on a diagnosis, the severity of a claimant's symptoms, or the side effects of medications

7    in relationship to a claimant's ability to work, the ALJ noted that layperson's opinion "is far less

8    persuasive on those same issues than are the opinions of medical professionals as relied on

9    herein."  *Id.*  Ms. Chargualafs' allegations and admissions were largely similar to Ms. Uncango's

10   statements.  *Id.*  Although Chargualaf stated she did not know Uncango's activities of daily

11   living, she confirmed that Uncango cared for her daughters.  AR 36, 140.  Ms. Chargualaf

12   reported that Uncango was able to do household chores such as laundry, washing dishes,

13   vacuuming, sweeping, and dusting.  AR 141.  She also noted that Ms. Uncango could prepare

14   food, go outside, drive a vehicle, shop for groceries, pay bills, watch television, listen to music,

15   and "mingle" on holidays.  AR 142–43.  However, the report claimed that medication did not

16   seem to help Ms. Uncango's pain as she still experienced pain while sitting and lying down.

17   AR 139.  The ALJ found that Ms. Chargualaf's opinion was not an unbiased because she had a

18   relationship motivation to support Uncango.  AR 36.  Most importantly, the ALJ found Ms.

19   Chargualaf's statements were not supported by the clinical or diagnostic medical evidence

20   discussed in his Decision.  *Id.*  The ALJ concluded that Chargualaf was only credible to the

21   extent Ms. Uncango could do the work.  *Id.*

22       After analyzing Uncango's credibility pursuant to SSR 96–7p, Fed. Reg. 34,483-01 (July

23   2, 1996)), the ALJ determined that her allegations were not fully credible.  AR 35.  In contrast to

24   her alleged impairments, Uncango maintained "a somewhat normal level of daily activity and

25   interaction.  AR 36.  The ALJ opined that some of the physical and mental abilities and social

26   interactions required to perform Uncango's daily activities are the same as those necessary for

27   obtaining and maintaining employment.  *Id.*  Thus, her ability to participate in such activities

28   undermined the credibility of her allegations of disabling functional limitations.  *Id.*

1    The ALJ considered and discussed Uncango's treatment records dated August 2009

2 through March 2012.  AR 36.  The ALJ also considered but did not completely adopt the RFC

3 assessments of any consultative examiner or state agency consultant.  AR 37.  The ALJ

4 determined that the assessments of all opining physicians were "generally consistent," finding

5 that (i) all assessed that Uncango was able to perform a range of work with some differences in

6 the degree of specific function-by-function limitations, and (ii) the opinions were "all reasonable

7 and supported by the record as a whole."  *Id*.  The ALJ adopted "specific restrictions on a

8 function-by-function basis" that were "best supported by the objective evidence as a whole."  *Id*.

9 The ALJ noted that no medical source statement from any source suggested functional

10 limitations more restrictive than the RFC stated in the Decision.  *Id*.  *See also* AR 359–89

11 (Consultative Examination Reports by Zev Lagstein, M.D., for internal medicine, Simon J.

12 Farrow, M.D., for neurology, and Quinton Spencer, O.D., for ophthalmology); AR 285–92

13 (Physical RFC Assessment by Elsie Villaflor, M.D.).  In addition, the ALJ considered and gave

14 great weight to the assessments of the state agency psychiatric consultants who opined that Ms.

15 Uncango's mental impairments were non-severe and that she had had no restrictions on activities

16 of daily living; no difficulties in maintaining social functioning; mild difficulties in maintaining

17 concentration, persistence, or pace; and no repeated episodes of decompensation, each of

18 extended duration.  AR 37 (citing AR 196–209, 267–80 (Psychiatric Review Technique Forms

19 by Mark Richman, Ph.D., and Pastora Roldan, Ph.D.)).  He adopted a similar mental RFC as the

20 state agency psychiatric consultants "given there were no treatment records regarding psychiatric

21 claims."  *Id*.

22    The ALJ's findings regarding Ms. Uncango's RFC were more generous than that of Dr.

23 Lagstein, the internal medicine physician who opined that Uncango would be able to perform a

24 range of medium work.  AR 37 (citing AR 359–70, Dr. Lagstein's Report).  The ALJ noted that

25 Dr. Lagstein's disability statement did not adequately take into consideration all of Ms.

26 Uncango's subjective and objective symptoms, signs, limitations, and severity of condition

27 including side effects of medication.  *Id*.  Additionally, the ALJ determined that Dr. Lagstein was

28 also unable to have access to Uncango's entire medical record and testimony.  *Id*.  Thus, the ALJ

1    found that Uncango's physical restrictions were more limiting and lowered her RFC to a range of

2    light work.  *Id*.  Ms. Uncango does not challenge the ALJ's findings regarding the medical

3    evidence, AR 33–36, or the weight afforded to the consultative examiners or the state agency

4    psychiatric consultants, AR 37–38.  *See* Pl's Mot. (ECF No. 21).

5         In sum, Uncango's subjective complaints were deemed less than fully credible and the

6    objective medical evidence did not support the alleged severity of her symptoms.  AR 38.  Thus,

7    the ALJ found that the evidence as a whole supported the RFC assessed in the Decision.  *Id*.

8         Once an ALJ has determined a claimant's RFC as an initial consideration at step four, an

9    ALJ utilizes the RFC assessment to determine whether a claimant can perform her PRW.  20

10   C.F.R. §§ 404.1520(f), 416.920(f).  PRW means work performed either as a claimant actually

11   performed it or as it is generally performed in the national economy within the last fifteen years

12   or fifteen years prior to the date that disability must be established.  In addition, the work must

13   have lasted long enough for a claimant to learn the job and to perform it as SGA.  20 C.F.R.

14   §§ 404.1560(b), 404.1565, 419.960(b), 416.965.  If a claimant has the RFC to perform his or her

15   past work, then an ALJ makes a finding that a claimant is not disabled.

16        At step four in the Decision, the ALJ concluded that Uncango had no PRW.  AR 38.  As

17   a result, the ALJ continued to step five.

18        **E.     Step Five**

19        Step five of the disability evaluation requires an ALJ to determine whether a claimant is

20   able to do any other work considering his RFC, age, education, and work experience.  20 C.F.R.

21   §§ 404.1520(g), 416.920(g).  If he or she can do other work, then an ALJ makes a finding that a

22   claimant is not disabled.  Although a claimant generally continues to have the burden of proving

23   disability at this step, a limited burden of going forward with the evidence shifts to the

24   Commissioner.  The Commissioner is responsible for providing evidence that demonstrates that

25   other work exists in significant numbers in the national economy that the claimant can do.

26   *Yuckert*, 482 U.S. at 141–42; *see also Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012) (citing

27   42 U.S.C. § 423(d)(2)(A)).

28

The Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, commonly known as the "Grids," aid the ALJ in the analysis at step five for cases that cannot be evaluated on medical considerations alone.   The Grids consist of three "Tables" that each represent a different RFC: sedentary, light, and medium work.  *Id*.  Each Table also presents the vocational factors Congress has identified as important: age, education, and work experience. For individuals whose characteristics match the criteria of a particular Grid rule, each rule "directs a conclusion as to whether the individual is or is not disabled.  *Id*.  When a claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has non-exertional limitations, the ALJ uses the Grids as a framework for decision-making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or non-exertional limitations.  *See* SSR 83-12, SSR 83-14, 43 Fed. Reg. 55349-01 (Nov. 28, 1978).  If a claimant has solely non-exertional limitations, section 204.00 of the Grids provides a framework for decision-making.  *See* SSR 85-15, 43 Fed. Reg. 55349-01 (Nov. 28, 1978).[3]

At step five in the Decision, the ALJ determined that Ms. Uncango could perform jobs that exist in significant numbers in the national economy, considering her age, education, work experience, and RFC, in conjunction with the Grids.  AR 38.  On the alleged date of disability, she was 43 years old, which categorized her as a younger individual age 18–49.  *Id*.  Uncango has at least a high school education and is able to communicate in English.  *Id*.   The transferability of her job skills was not an issue because she had no PRW.  *Id*.

If Ms. Uncango had the residual functional capacity to perform the full range of light work, the ALJ noted that Medical-Vocational Rule 202.20 would direct a finding of "not disabled."  *Id*.  However, Uncango's additional limitations impeded her ability to perform all or substantially all of the requirements of light work.  *Id*.  To determine the extent to which her limitations eroded the unskilled light occupational base, the ALJ asked a vocational expert, Kenneth Lister, M.Ed., a hypothetical question regarding whether jobs exist in the national

---

[3]  SSRs 83-12, 83-14, and 83-15 were rewritten to make them easier to understand and then republished. *See* 45 Fed. Reg. 55566 (Aug. 20, 1980).

economy for an individual with Uncango's age, education, work experience, and RFC.  AR 38–39, 66–70.  Citing the Dictionary of Occupational Titles ("DOT"), Mr. Lister testified that the individual would be able to perform the requirements of three representative jobs:

1. Casino Host (DOT 349.667-014, 1991 WL 672884), which is light, unskilled work, specific vocational profile ("SVP") of 2, 7,000 national jobs, and regional jobs approximately 2% of the national amount;

2. Call Out Operator (DOT 237.367-022, 1991 WL 672188), which is sedentary unskilled work, SVP 2, 187,000 national jobs, regional jobs approximately 2% of the national amount; or

3. Surveillance System Monitor (DOT 379.367-010, 1991 WL 673244), which is sedentary unskilled work, SVP 2, 150,000 national jobs, regional jobs approximately 2% of the national amount.

AR 39.  During the hearing, Plaintiff's counsel asked Mr. Lister to add a "sit/stand option"[4] to the ALJ's hypothetical.  AR 69.  Mr. Lister testified that the casino host job would eliminated and the call out operator job would remain with a 50% erosion of such jobs.  AR 70.  The surveillance system operator would remain available with no erosion.  AR 70.

The ALJ found that these three representative jobs were significant numbers and Mr. Lister's testimony was consistent with the DOT.  AR 39.  The ALJ noted that the DOT did not address a sit/stand option and Mr. Lister's testimony regarding this option was based on his experience.  *Id*.  A sit/stand option was not supported by the evidence; however, even with a sit/stand option, the ALJ found that Ms. Uncango could work as either a call out operator (with a 50% erosion) or a surveillance system monitor.  *Id*.  This would still leave a significant number

---

[4]  Neither the Decision nor the hearing testimony define the so-called "sit/stand option."  *See* AR 38–39, 69–70.  In an unpublished decision, the Ninth Circuit noted that the DOT does not discuss a "sit-stand option" and stated that the term was "most reasonably interpreted as sitting or standing 'at-will', based on the record."  *Buckner-Larkin v. Astrue*, 450 F. App'x 626, 627 (9th Cir. 2011) (finding that "conflict" between "sit/stand option" and DOT was adequately addressed by the vocational expert).  In another unpublished decision, the Ninth Circuit cited SSR 83-12 with regard to the sit-stand option, noting that in some disability claims, the claimant's RFC assessment "is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing."  *Manes v. Astrue*, 267 F. App'x 586, 588 (9th Cir. 2008).  Ms. Uncango does not challenge the exclusion of the sit/stand option from her RFC or Mr. Lister's testimony regarding the sit/stand option.

of jobs. *Id*. Considering Uncango's age, education, work experience, and RFC, the ALJ determined that she could perform jobs that exist in significant numbers in the national economy. *Id*. A finding of "not disabled" was, therefore, appropriate under the framework of the Grids. *Id*.

### III.   THE PARTIES' POSITIONS ON APPEAL

#### A.   Ms. Uncango's Position

Ms. Uncango seeks reversal and remand of the ALJ's decision on the grounds that the ALJ failed to properly assess her subjective symptom testimony in assessing her RFC by failing to properly conduct the mandated two-step analysis. Pl.'s Mot. (ECF No. 21) at 4–5. She contends the ALJ erred by rejecting her testimony solely on a lack of objective medical evidence. *Id*. at 8. The ALJ may not reject Ms. Uncango's testimony "based on a belief that the testimony is not credible because it lacks support in the objective medical evidence." *Id*. at 7:20–23 (citing AR 36–38; *Bunnell v. Sullivan*, 947 F.2d 341, 345–46 (9th Cir. 1991) (en banc)). Rather, the ALJ must find Uncango "not credible as a witness." *Id*. at 9:5–6.

Additionally, Ms. Uncango argues that her ability to perform limited activities of daily living was not a clear and convincing reason to discount her complaints. *Id*. at 9. The ability to perform various activities of daily living does not necessarily translate into the ability to perform in a work setting on a consistent basis. *Id*. at 11. Uncango asserts that the ALJ ignored *how* she performed her activities, "which is to say not consistent with the ability to perform work activity. *Id*. at 12. The ALJ's failure to consider the differences between Ms. Uncango's "sparse daily activities and her ability to work" full time was reversible error. *Id*. at 11.

#### B.   The Commissioner's Position

The Commissioner seeks affirmance of the ALJ's Decision asserting that the ALJ properly assessed Ms. Uncango's credibility and determined that she is not disabled. Opp'n & Cross-Mot. (ECF Nos. 22, 23). The Commissioner argues that the Decision provides specific, permissible reasons for finding Uncango's testimony less than fully credible and her disagreement with the ALJ is not evidence of error. *Id*. at 2. For example, in contrast to her admitted activities such as driving, grocery shopping, and housework, Uncango claims total dysfunction. *Id*. at 4–5 (citing AR 54–56, 148–49).

1       Additionally, the Commissioner asserts that Uncango's activities were not sporadic or

2  minimal.  *Id.* at 5.  Uncango admitted that she: prepared food daily, AR 149; washed clothes on

3  weekends, dusted and vacuumed every other day, and washed dishes whenever needed, AR 149;

4  drove her daughter to school every day, AR 56; went outside at least once a day, AR 150;

5  shopped for groceries twice a month, AR 150.  The ALJ relied on Uncango's own reports of her

6  ability to do these activities on a regular basis; therefore, Uncango's argument that the ALJ

7  ignored how she performed her activities fails.  Opp'n & Cross-Mot. at 5.

8       The Commissioner further argues that the Motion misstated the law and the ALJ's

9  findings.  Ms. Uncango relied on *Bunnell* for the proposition that an ALJ may not rely on a lack

10  of objective medical evidence to reject subjective pain testimony.  Pl.'s Mot. (ECF No. 21) at 7–

11  8.  The Commissioner asserts that "*Bunnell* prohibits discrediting Uncango's statements *solely*

12  on the basis of conflicting objective evidence."  Opp'n & Cross-Mot. at 6; *see Bunnell*, 947 F.2d

13  at 343–46.  "The *Bunnell* standard is not applicable where, as here, the ALJ cited to the

14  inconsistency between Uncango's statements and the medical evidence *in addition to* contrasting

15  Uncango's allegations to her relatively normal activities of daily living."  *Id*. at 6:2–5.  The ALJ

16  cited to specific evidence about Ms. Uncango's daily activities and connected his findings about

17  her activities to his conclusion that Uncango was not credible by stating that despite Uncango's

18  alleged impairments, her activities constituted a "relatively normal level of daily activity and

19  interaction."  *Id*. at 6:22–25 (citing AR 36).  The Decision explained the ALJ's reasoning and

20  gave clear analysis of the record in support of his opinion.  *Id*. at 6 (citing AR 36–38).  Thus, the

21  Commissioner maintains that the ALJ's credibility finding is supported by substantial evidence

22  and free from legal error.

## ANALYSIS AND FINDINGS

24       Reviewing the record as a whole, weighing both the evidence that supports and the

25  evidence that detracts from the ALJ's conclusion, the court finds the ALJ's decision is supported

26  by substantial evidence, and the ALJ did not commit legal error.

**I.      THE ALJ PROPERLY EVALUATED MS. UNCANGO'S CREDIBILITY**

In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)).  In the first step, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007).  In this first step, a claimant need only show that his or her impairment could reasonably have caused *some degree* of the symptom alleged. *Garrison*, 759 F.3d at 1014 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)).  A claimant is not required to (i) show that the impairment could reasonably be expected to cause the severity of the symptom, or (ii) produce objective medical evidence of the pain or fatigue, or the severity thereof. *Id.*

If a claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ may only reject the claimant's testimony about the severity of her symptoms "by offering specific, clear and convincing reasons for doing so." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (quoting *Lingenfelter*, 504 F.3d at 1036); *see also Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each.").[5]  As the Ninth Circuit has recognized, this is not an easy requirement to meet because the "clear and convincing standard is the most demanding required in Social Security cases." *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r Soc. Sec.*

---

[5]   The Commissioner argues that the "clear and convincing" standard does not apply to the ALJ's credibility determination because it is contrary to 42 U.S.C. § 405(g) and does not give proper deference to the standard set forth in SSA regulations.  *See* Opp'n & Cross-Mot. (ECF Nos. 22, 23) at 3 n.1 (discussing *Garrison*, 759 F.3d at 1015 n.18; *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014)).  However, the Ninth Circuit has specifically and repeatedly rejected this position.  *Brown-Hunter v. Colvin*, 806 F.3d 487, 492–93 (9th Cir. 2015) (noting that the Commissioner disputed the "clear and convincing" standard and finding that *Burrell* foreclosed the Commissioner's argument).

*Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).  However, "the ALJ is not required to believe every allegation of disabling pain," otherwise disability benefits "would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  *Molina*, 674 F.3d at 1112 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's testimony, the ALJ may use "ordinary techniques of credibility evaluation."  *Molina*, 674 F.3d at 1112 (quoting *Turner v. Comm'r Soc. Sec.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010)).  For example, an ALJ may consider factors such as: (i) inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct; (ii) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (iii) whether the claimant engages in daily activities inconsistent with the alleged symptoms; (iv) the observations of treating and examining physicians and other third parties regarding the claimant's symptoms; (v) functional restrictions caused by the symptoms; and (vi) the claimant's daily activities.  *Molina*, 674 F.3d at 1112; *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015) (quoting *Smolen*, 80 F.3d at 1284).

"A finding that a claimant's testimony is not credible 'must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain'."  *Brown-Hunter*, 806 F.3d at 493 (quoting *Bunnell*, 947 F.2d at 345–46).  "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Brown-Hunter*, 806 F.3d at 493 (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)); *see also Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("the ALJ must specifically identify the testimony she or he finds not to be credible and must *explain* what evidence undermines the testimony" (emphasis added)).  "Although the ALJ's analysis need not be extensive, the ALJ must provide some reasoning" that will allow a reviewing court "to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence."  *Brown-Hunter*, 806 F.3d at 495 (quoting *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014)).

In this case, the ALJ's credibility findings are supported by substantial evidence because the Decision articulates specific reasons for determining that Ms. Uncango's testimony was not fully credible. AR 35–38. The Decision states that her ability to participate in "a somewhat normal level of daily activity and interaction" undermined the credibility of her "allegations of disabling functional limitations." AR 36. For example, the ALJ noted that Uncango prepared meals, helped her daughters with their homework, and watched television. AR 35, 147–54. She admitted she could do housework including washing dishes, washing clothes, dusting, and vacuuming. AR 35, 149. She reported that she drove a vehicle, went outside at least once a day, and regularly shopped in stores. AR 35, 150. Uncango's self-reports demonstrate that her daily activities were not sporadic or minimal and they contradict her claims of totally debilitating impairments. Notably, the third-party function report prepared by Ms. Chargualafs presented allegations and admissions very similar to Ms. Uncango's statements. AR 36 (citing AR 139–46). Based on the testimony and medical evidence, the ALJ could reasonably conclude that Uncango's daily activities undermined her claim that she was incapable of doing sedentary light work because of her pain. AR 35–38, 139–54.

Ms. Uncango asserts that her ability to perform limited activities of daily living was not a clear and convincing reason to discount her complaints. It is true that a claimant need not vegetate in a dark room to be eligible for benefits; however, "the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting." *Molina*, 674 F.3d at 1112–13. Even when those activities suggest some difficulty in functioning, "they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Id.* at 1113 (affirming ALJ's decision to discount claimant's testimony based on inconsistencies with claimant's alleged total disability and her daily activities such as caring for her young grandchildren, driving a car short distances, shopping once a month, and watching TV); *see also Rounds*, 807 F.3d at 1006 (affirming adverse credibility determination based on inconsistencies with claimant's alleged total disability and her ability to care for her daughter and her cats, prepare simple meals, share house work with her roommate, shop for groceries, and pay bills

even though she testified about intermittent severe pain in her shoulders, neck, and back); *Morgan v. Apfel*, 169 F.3d 595, 600 (9th Cir. 1999) (claimant's ability to fix meals, do laundry, work in the yard, and occasionally care for his friend's child was evidence of claimant's ability to work).

However, the Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016 (citing *Smolen*, 80 F.3d at 1287 n.7 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication."); *Fair*, 885 F.2d at 603 ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."). Recognizing that "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations," the Ninth Circuit has held that a claimant's activities of daily living would have a bearing on her credibility only if her level of activity were inconsistent with her claimed limitations. *Garrison*, 759 F.3d at 1016 (quoting *Reddick*, 157 F.3d at 722).

In this case, the ALJ reasonably concluded that Uncango's daily activities were inconsistent with her claimed total disability. In *Garrison*, the claimant was heavily assisted by her mother in caring for her daughter, was regularly prohibited from activities such as doing laundry, and would often nap for several hours per day. *Id*. Thus, her ability to talk on the phone, prepare meals once or twice a day, and occasionally clean a room was still consistent with an inability to function in a workplace environment. *Id*. The Ninth Circuit therefore found that the supposed inconsistencies did "not satisfy the requirement of a clear, convincing, and specific reason" to discredit Garrison. *Id*. In contrast, here, the ALJ found that Ms. Uncango was able to care for her daughters by preparing simple meals and helping them with their homework. AR 35; *see also* AR 140, 148 (reporting that no one assisted Uncango in caring for her

21

daughters).   Among other activities explicitly described, the ALJ noted that she was able to do housework regularly including washing dishes, washing clothes, dusting, and vacuuming, AR 35, 149, although she testified that she had some difficulty sweeping and used her right arm to vacuum due to pain in her left, AR 57.   The ALJ also found that Uncango could walk 20 feet before needing to rest, AR 35, which she indicated would last about five minutes.   AR 152.   The ALJ specifically identified what evidence supported his finding that Ms. Uncango engaged in a "somewhat normal level of activity," and noted that some of the physical and mental abilities and social interactions required to perform her daily activities were the same as those necessary for obtaining and maintaining employment.   AR 36.   Thus, the ALJ reasonably concluded that her daily level of activity undermined the credibility of her allegations of disabling functional limitations.   *Id*.

In addition, the ALJ did not reject Uncango's testimony based solely on a lack of medical evidence.   Rather, to justify discounting Uncango's testimony, the ALJ found that Uncango was given routine conservative medical care for her conditions including prescription medications. AR 36.   In particular, the ALJ noted that no medical source statement from any source suggested functional limitations more restrictive than the RFC stated in the Decision.   AR 37.   He also noted the lack of treatment records regarding psychiatric claims.   *Id*.   The ALJ did not completely adopt the RFC assessments of any consultative examiner or state agency consultant, but adopted "specific restrictions on a function-by-function basis" that were "best supported by the objective evidence as a whole."   *Id*.   The ALJ gave her the benefit of the doubt by restricting her to light work, even though Dr. Lagstein opined that she would be capable of performing a range of medium work.   *Id*.   AR 37.   However, the ALJ found that Uncango's testimony regarding the severity of her symptoms, which was similar to that of Ms. Chargualaf, was not supported by the clinical or diagnostic medical evidence.   AR 36–37.   *See Carmickle v. Comm'r, Social Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); *Rounds*, 807 F.3d at 1006 (finding that the ALJ did not err by discounting the claimant's testimony about the severity of her symptoms because her medical records and daily activities showed a higher level of

functionality); *Molina*, 674 F.3d at 1112–14 (affirming ALJ's decision to discount claimant's testimony based on inconsistencies with her daily activities and the medical evidence). Viewed as a whole, the ALJ's adverse credibility was based on his finding that Uncango's testimony was inconsistent with her daily activities and the medical evidence, which both showed a higher level of functionality than what she alleged. Because the ALJ's adverse credibility determination was supported by specific, clear, and convincing reasons, the court must uphold it.

## **CONCLUSION**

Judicial review of a decision to deny disability benefits is limited to determining whether the decision is based on substantial evidence reviewing the administrative record as a whole. It is the ALJ's responsibility to make findings of fact, draw reasonable inferences from the record as a whole, and resolve conflicts in the evidence and differences of opinion. Having reviewed the Administrative Record as a whole, and weighing the evidence that supports and detracts from the Commissioner's conclusion, the Court finds that the ALJ's decision is supported by substantial evidence under 42 U.S.C. § 405(g).

Accordingly,

**IT IS RECOMMENDED:**

1.  Plaintiff's Motion to Remand (ECF No. 21) be DENIED.

2.  The Commissioner's Cross-Motion to Affirm (ECF No. 23) be GRANTED.

3.  The Clerk of Court be instructed to enter judgment accordingly and close this case.

Dated this 30th day of September, 2016.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE